THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| CEAL SWIGERT, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No.: RDB-08-1139 |
| BROADWAY SERVICES, INC., | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

This employment discrimination action arises out of a Complaint filed by Ceal Swigert ("Plaintiff" or "Swigert") against her former employer, Broadway Services, Inc. ("Defendant" or "Broadway"). Plaintiff asserts two causes of action alleging racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII"). Currently pending before this Court are Plaintiff's Motion for Partial Summary Judgment (Paper No. 13) and Defendant's Cross Motion for Summary Judgment (Paper No. 14). This action was originally filed in the Circuit Court for Baltimore City, Maryland and was removed to this Court pursuant to 28 U.S.C. § 1441. The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2008). For the reasons stated below, Plaintiff's Motion for Partial Summary Judgment is DENIED and Defendant's Cross Motion for Summary Judgment is GRANTED.

## BACKGROUND

On August 5, 1999, Plaintiff Ceal Swigert, a Caucasian female, was employed by Defendant Broadway Services, Inc., a contract management company that provides

housekeeping, security, and maintenance services to businesses and healthcare institutions. (Pl.'s Mot. Summ. J. 1; Def.'s Mot. Summ. J. 1.)  Swigert was hired as a full-time floor technician and her duties were to clean, buff, varnish, and maintain parts of the Mason F. Lord Building on the campus of the Johns Hopkins University Bayview Medical Center.  (Compl. ¶ 5.)  By the time that she was discharged from her employment, more than six years later, Swigert had been disciplined on twenty-one separate occasions for various acts of misconduct.

The Mason Lord Building is divided into two towers of equal footage, East and West. (Pl.'s Mot. Summ. J. at 1.)  Swigert was assigned to maintain the West Tower building, including "all 6 floors, 12 bathrooms in the West Tower and hauling industrial trash bins from the 6 floors of the West Tower to the East Tower."  (*Id*. at 1-2.)  In the East Tower, three floor technicians, who are African-American, were required to maintain two floors each and haul the trash from those two floors to the lower level of the East Tower.  (*Id*. at 2.)  Swigert claims that she was "held accountable for three times the work load of her 'similarly situated' African-American employees" because the West Tower was occupied with tenants on all floors.  (*Id*.; Swigert Aff. ¶ 4.)  Broadway, however, states that the West Tower was not fully occupied (Def.'s Reply 7) and Ramsey testified that only "60 percent of the building was . . . open." (Ramsey Dep. 7: 12-14.)

Swigert claims that her supervisor, Patricia Ramsey treated her differently on the basis of her race and that she favored the African-American employees.  Although Ramsey is also a Caucasian woman, it is alleged that Ramsey publicly considers herself to be African-American. Swigert contends that she was not given any assistance from other technicians, but that similarly-situated African-American workers assigned to the East Tower "were provided help to complete their two floors."  (Pl.'s Mot. Summ. J. 2.)  Despite being overwhelmed by her assigned duties,

she was frequently ordered by her supervisor to stay beyond her normal shift and perform the work of others. (Compl. ¶ 17.) In addition, Swigert maintains that, Ramsey "deliberately excluded and asked Swigert to leave meetings and smoke-breaks" when no African-Americans were asked to leave. (*Id*. at ¶¶ 16-17.)

Two of Swigert's co-workers, Alicia Reed-Knight and Donald M. Swann—who are both African-American—have submitted affidavits in support of Swigert's allegation of racial preference. They both claim that Swigert's responsibility for cleaning all six floors of the West Tower, which were occupied and close to full, was far greater than the responsibilities assigned to African-American employees. (Reed Aff. ¶¶ 3-4; Swann Aff. ¶¶ 3-4.) In addition, Reed-Knight believes that Ramsey "favored Blacks," (Reed Aff. ¶ 6), and Swann claims to have heard Ramsey state that she didn't like Swigert and preferred working with black employees. (Swann Aff. ¶ 7.) Reed-Knight supports Swigert's contention that she was excluded from work breaks and meetings and stated that "[n]o Black employees were intentionally left out like that." (Reed Aff. ¶ 6.)

Ramsey, however, denies having made any statements in which she characterized herself as black or in which she expressed a preference for working with African-American employees. (Ramsey Aff. ¶ 20.) Ramsey also disputes the claim that Swigert was excluded from work meetings or denied assistance because of her race. (*Id*. at ¶ 19.)

Both parties agree that Swigert's termination was precipitated by disputes involving Swigert and floor manager Floyd Young ("Young"). Beginning in August 2005 her working relationship with Young progressively worsened after she complained to Ramsey that Young was "slacking off" and making her work more difficult. (Compl. ¶ 9.) She alleges that on three occasions Young put his hands on her in a threatening manner and that when she reported these

incidents, Ramsey took no remedial actions.  (*Id*. at ¶ 10.)  In July of 2005 Young allegedly shoved a pager at her chest at the end of her shift and then followed her down the stairs as she attempted to leave.  (Pl.'s Ex. 9 at 2; Def.'s Ex. 22 at 3-4.)  In August of 2005, while she was on her lunch break, Young allegedly raised his voice at her and pointed his finger in her face.  (Pl.'s Ex. 9 at 2.)  Finally, on November 10, 2005, Swigert contends that she attended a meeting with Young and Ramsey and that when she began to stand up Young grabbed her arm, trying to force her to sit back down.  (*Id*.)  Swigert told Young that he was not supposed to touch her and claims that, despite witnessing the incident, Ramsey did nothing about it.  (*Id*.)  Ramsey disputes these allegations, and explains that Young merely tapped Swigert on the shoulder to "get her attention" and that the incident was promptly addressed by Ramsey in a counseling session.  (Def.'s Ex. 24; Young Aff. ¶¶ 5-6.)

Swigert questions the veracity of Ramsey's claims concerning the November 10, 2005 meeting.  She claims that the documents provided by Ramsey regarding the counseling session are not credible because they were manufactured in anticipation of the current litigation and were fraudulently backdated to make it appear that they were created at the time of the incident.  (Pl.'s Reply 6.)  She notes that Ramsey conceded at her deposition that she dated the counseling memorandum as if it was signed on November 10, despite the fact that she actually drafted the document at a later date.  (Pl.'s Mot. Summ. J. 4; Ramsey Dep. 28-31.)

In November of 2005 Swigert spoke with Ramsey's supervisors and told them that her working conditions had become intolerable and that intervention was necessary.  (Compl. ¶¶ 10-12.)  She states that after she complained about one of her disputes with Young, Ramsey indicated that she considers herself to be a black woman and that she believed Young's recollection of the incident because he is black.  (*Id*. at ¶14; Pl.'s Ex. 5 ¶ 8.)

4

On November 29, 2005, at the end of her shift, Swigert placed her pager and work order down on a counter, rather than handing them directly to Young. (Swigert Dep. 82:10-16.) Broadway policy requires employees to physically hand their keys and pagers to a supervisor at the end of their shifts. (Def.'s Mot. Summ. J. 3.) Swigert admits that she did not hand the pager to Young, but explains that in her six years of working at Broadway, employees were never required to place pagers directly in their supervisors' hands. (Swigert Dep. 83:4-7.) She contends that her actions were sufficient to fulfill the requirements of Broadway's policy and that "[Young] was standing right there. All he had to do was stretch his hand out." (*Id*. at 83:21 - 84:1.) Swigert also admits that when Young requested to speak with her, she replied that she had already clocked out and that he would have to talk to her the next day. (*Id*. at 84:7-12.) She claims that her actions comported with company policy, which requires employees to leave work at the end of their shifts. (*Id*.) However, Broadway and Ramsey contend that Swigert's conduct violated the company's rules. (Def.'s Mot. Summ. J. 1-2.)

November 29, 2005, was the last day that Swigert worked for Broadway. (Swigert Dep. 31: 2.) Ramsey began the termination process on November 30, 2005 citing Swigert's "rude and discourteous behavior." (Ramsey Aff. ¶ 16.) On December 1, 2005, Swigert delivered a letter to Broadway's Personnel Department complaining of unfair treatment, abuse, and race discrimination. (Pl.'s Ex. 9; Pl.'s Reply 17.) That same day, the Assistant Director of the Mason Lord Building, Wayne Watson, approved Swigert's termination, which became effective on December 2, 2005. (Def.'s Reply 10.) Watson states that he was not aware of Swigert's letter alleging race discrimination at the time he approved her termination. (*Id*.; Def.'s Ex. 36 ¶ 7.)

Broadway claims that Swigert was terminated for her "long record of disciplinary violations, culminating in serious incidents of insubordination and disregard of workplace rules

5

in the final months of her employment." (Def.'s Reply 8.) Swigert was formally disciplined twenty-one times during her six years of employment with Broadway. (*Id.*) Her rule violations included failing to perform assigned tasks, falsifying records, leaving her work area during a shift, habitual tardiness, chronic absenteeism, insubordination, and conduct detrimental to the company. (*Id.*) Many of these violations did not involve any interaction with Young. (*See, e.g.*, Def.'s Exs. 8-14, 25, 26, 28.) Broadway notes that five of these incidents occurred during Swigert's final year of employment, and that many of them occurred after her final performance review. For instance, in addition to her encounter with Young on November 29, 2005, which precipitated her termination, Swigert had been disciplined in July of 2005 for seeking to confront a tenant in the West Tower who had complained about her job performance, and again in September of 2005, when she tossed her pager on a bench and told a supervisor that Ramsey "can shove [the pager] up her ass." (*Id.* at 11 (citing Def.'s Exs. 15-18).)

Swigert, on the other hand, contends that she was terminated on the basis of her race and in retaliation for complaining about race discrimination. (Compl. ¶ 19.) She claims that the disciplinary actions taken against her were solely the result of her disparate workload and her supervisor's discriminatory animus against non-African-Americans. She cites to her co-worker Reed-Knight's claims that Swigert was disciplined for "no good reason" (Reed Aff. ¶ 5), and that she was "single[d] out," because "on days that Ms. Ramsey wrote up Ms. Swigert for problems with cleaning, I could have been written up but was not." (*Id.*)

Swigert's performance reviews display a variety of performance levels, ranging from "highly effective" to "marginal." (Pl.'s Ex. 1.) In her reviews dated November 9, 2000, August 6, 2003, and March 21, 2005, Ramsey rated Swigert's performance as "effective" or "highly effective" in almost every category. (*Id.*) However, in her last performance review, dated

August 30, 2005, Swigert was rated as "effective," or meeting minimum requirements, in six categories, and as "marginal," or not meeting minimum requirements, in four categories. (*Id.*) In that review, Ramsey stated that Swigert's "overall evaluation is effective and some areas are marginal." (*Id.*)

After Swigert was terminated, she was replaced by Antoine Chisolm, an African-American, who worked for less than one month. (Pl.'s Reply 7.) Chisolm was then replaced by another African-American who also worked for less than one month. (*Id.*) Currently, Swigert's position is being filled by three part-time employees, all of whom are African-American. (*Id.*) Swigert accuses Broadway of racial favoritism, noting that "during the incidents of this case, the racial composition of the Defendant's work force was almost entirely Black and/or African-American." (Compl. at ¶ 8.) Broadway states that the "racial make-up of the Broadway Services 'housekeeping staff' at the Mason Lord Building is diverse, with a majority of 'housekeepers' being African-American." (Def.'s Mot. Summ. J. 2, n.3.)

Following an independent investigation by the Equal Employment Opportunity Commission ("EEOC") Swigert received a right to sue letter, and she filed her Complaint (Paper No. 2) in this Court on May 2, 2008. Plaintiff filed a Partial Motion for Summary Judgment (Paper No. 13) on October 17, 2008, and the Defendant filed a Cross Motion for Summary Judgment (Paper No. 14) on November 3, 2008.

## **STANDARD OF REVIEW**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A

7

material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. In that context, a court is obligated to consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). However, Rule 56 mandates summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When both parties file motions for summary judgment, as here, the court applies the same standards of review. *Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir. 1991); *ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material fact on a motion for summary judgment – even where . . . both parties have filed cross motions for summary judgment.") (emphasis omitted), *cert. denied,* 469 U.S. 1215 (1985). The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.,* 627 F. Supp. 170, 172 (D. Md. 1985). "[B]y the filing of a motion [for summary judgment] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Nafco Oil & Gas, Inc. v.*

*Appleman,* 380 F.2d 323, 325 (10th Cir. 1967); *see also McKenzie v. Sawyer,* 684 F.2d 62, 68 n.3 (D.C. Cir. 1982) ("[N]either party waives the right to a full trial on the merits by filing its own motion."). However, when cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "may be probative of the non-existence of a factual dispute." *Shook v. United States,* 713 F.2d 662, 665 (11th Cir. 1983) (citation omitted).

**DISCUSSION**

Swigert sets forth two causes of action under Title VII of the Civil Rights Act of 1964, which provides that "it shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In Count I, Swigert alleges that she was wrongfully discharged from her employment with Broadway on the basis of her race. In Count II, she asserts that she was unlawfully terminated in retaliation for complaining that she was being discriminated against on the basis of her race.

**I.   Title VII Race Discrimination Claim**

A plaintiff may establish a claim for intentional race discrimination under either the "mixed-motive" framework or under the "pretext," or "burden-shifting" schema set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973). *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 284-85 (4th Cir. 2004).

A) <u>Mixed Motive Framework</u>

To establish a "mixed-motive" claim of discrimination, a plaintiff must present sufficient direct or circumstantial evidence that a protected trait "was a motivating factor" in the adverse

9

employment decision. *Hill*, 354 F.3d at 284-86. More specifically, evidence must reveal that the protected trait "actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." *Id.* at 286 (internal quotations omitted).

Direct evidence of discrimination in this context is defined as "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc) (quotation marks omitted). Even if a statement exists that reflects a discriminatory attitude, it must bear some connection to the adverse employment action. *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006). In addition, the evidence must specifically pertain to an actual decisionmaker. *See Taylor*, 193 F.3d at 232 (noting that a "plaintiff qualifies for the more advantageous standard of liability applicable in mixed-motive cases if the plaintiff presents direct evidence that *decisionmakers* placed substantial negative reliance on an illegitimate criterion") (emphasis added); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring) (noting that "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [do not] suffice to satisfy the plaintiff's burden").

Among Swigert's various allegations of discrimination, the only one that could possibly qualify as direct evidence of discrimination is her claim that after raising concerns about being mistreated by Young, Ramsey stated that she was going to believe Young because he was black. (Compl. ¶ 14; Pl.'s Ex. 5 at ¶ 8.) However, this allegation cannot be characterized as "direct evidence" of racial discrimination for purposes of the mixed motive analysis. First, Swigert's allegation is conclusory in nature—she does not explain the circumstances surrounding the statement and when or where it was made. *See Douglass v. USAA*, 79 F.3d 1415, 1429 (5th Cir.

1996) (en banc) ("conclusory allegations, speculation, and unsubstantiated assertions are inadequate"). Second, even if Ramsey did make such a statement reflecting a discriminatory attitude, Swigert does not show any connection between the statement and any adverse employment action. Indeed, the record indicates that such a statement could not have been made after Swigert's final confrontation with Young on November 29, 2005, which precipitated her termination. Swigert stated that she left immediately after the incident and never returned to work in the future. (Def.'s Ex. 1 at 19, 31, 84.) Ramsey was not at work at the time of the incident, which she only learned about after receiving a telephone call from Young. (Def.'s Ex. 21 at ¶ 15.)

Without any direct evidence of discrimination, Swigert presents several allegations, generally relating to the terms and conditions of her employment, that purport to be circumstantial evidence of discrimination. Swigert claims that she was assigned to greater workloads, unfairly disciplined, and excluded from meetings and smoke-breaks and denied assistance. (Compl. ¶ 17.) However, Swigert cannot satisfy her burden on the basis of these assertions both because they are unsubstantiated and because they are not probative of whether Broadway acted with discriminatory animus.

As an initial matter, Swigert fails to establish that she was entrusted with more responsibilities at work because of her race. She argues that she was "held accountable for three times the work load of her 'similarly situated' African-American employees" because the West Tower was occupied with tenants on all floors. (Pl.'s Mot. Summ. J. 2; Swigert Aff. ¶ 4.) Broadway contests this assertion by claiming that the West Tower was partially unoccupied and that Swigert was not responsible for the unoccupied areas. (Def.'s Ex. 23 at 7, 9.) However, even if the West Tower was fully occupied, Swigert does not address the fact that her former

11

position was eventually filled by two African-American employees who were both assigned the same work duties—evidence that undermines her argument that she was singled out for greater workloads because she is Caucasian. *See Gordon v. Gutierrez*, No. 06-861, 2007 U.S. Dist. LEXIS 253, at *27 (E.D. Va. Jan. 4, 2007) (holding that plaintiff could not establish a "triable issue of fact on the issue of disparate treatment because she has not shown that the [work] she received was significantly less favorable than the [work] provided to the comparators").

With respect to her claims that she was denied assistance and excluded from work meetings, Swigert offers only broad generalities and bald allegations, which cannot support a Title VII claim. Indeed, she does not identify any specific meetings from which she was excluded, nor any times when she requested help and was denied. Although she submitted affidavits from her fellow employees stating that she was "single[d] out" and disciplined for "no good reason" (Reed Aff. ¶ 5), these submissions are of very little evidentiary value. *See, e.g.*, *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 135 (4th Cir. 2002) (". . . affidavits [of other employees] . . . amount to no more than subjective beliefs, and such evidence, without more, is insufficient to create a genuine issue of material fact as to any discriminatory conduct on [defendant's] part."); *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 235 (4th Cir. 1991) ("that co-workers . . . may have thought [s]he did a good job, or that [s]he did not 'deserve' the ratings . . . is close to irrelevant").

The evidence in the record may suggest that Swigert was subjected to uncomfortable job conditions and that some of her supervisors, including Ramsey and Young, were mean-spirited, uncivil, and rude. However, "complaints premised on nothing more than rude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor, are not actionable under Title VII." *E.E.O.C. v.*

*Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008) (quotations and citations omitted). Indeed, Swigert's allegations fall short for the fundamental reason that the evidence in the record does not raise the inference that she was unfairly treated *on account of her race*.[1] *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 153 (2000) ("the ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination"). To show that Ramsey was motivated by a race-based animus, Swigert must provide more than bare assertions and personal opinions. *Olliff v. Potter*, 2008 U.S. Dist. LEXIS 84402, at *12 (E.D. Va. Oct. 21, 2008) ("[t]o raise a reasonable inference of unlawful discrimination, [a plaintiff] must provide more than speculative evidence, generalities, or gut feelings"). Thus, this Court finds that Plaintiff has failed to "present[] probative circumstantial evidence to show that [the employer] acted with discriminatory animus." *Warch*, 435 F.3d at 521.

As Swigert has failed to provide sufficient evidence under the "mixed motive" theory, her claim can only survive under the alternative *McDonnell Douglas* "burden-shifting" framework.

B) *McDonnell Douglas* Framework

To make out a *prima facie* case of discrimination under the *McDonnell Douglas* scheme, Plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was performing her job duties at a level that met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) her position was filled by a similarly qualified person outside of the protected class. *Hill*, 354 F.3d at 285. Once a plaintiff has made a *prima facie* case, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the

---

[1] This is an especially fatal error in Swigert's attempt to make a convincing claim of discrimination due to the unique facts of this case. After all, Swigert is a white woman who is claiming that Ramsey—another white woman—discriminated against her on the basis of race.

13

adverse employment action. *Hoffman v. Baltimore Police Dep't*, No. 04-3072, 2009 U.S. Dist. LEXIS 6626, *41 (D. Md. Jan. 21, 2009). If the employer fulfills this corresponding duty, the burden reverts back to the plaintiff to establish that the defendant's proffered reason is pretextual. *Id*.

Broadway contends that Swigert cannot establish a *prima face* case of discrimination because she was not meeting its legitimate expectations at the time of her termination. Broadway points to Swigert's performance and disciplinary records as evidence that she did not satisfactorily fulfill her responsibilities and was frequently engaged in insubordinate and disruptive behavior.

The evidence in the record paints a generally mixed picture of Swigert's performance on the job with some evidence of deterioration over time. Swigert had received high marks in many of her earlier performance reviews, and even in one dated as late as March 21, 2005. (Pl.'s Ex. 1.) However, Swigert's final review of August 30, 2005—issued three months before her ultimate termination—reveals significant deterioration in her performance. In this evaluation she only received a rating of "effective" in six categories and a rating of "marginal" (defined as not meeting minimum requirements) in the categories of job performance, judgment, reliability, and cooperation. (Pl.'s Ex. 1.)

Swigert's disciplinary record, on the other hand, reveals a stark picture of continued misconduct, particularly in the weeks leading up to her termination. In her six years with Broadway, Swigert was formally disciplined on twenty-one separate occasions, and five of these incidents occurred during her final year of employment. Indeed, many of these disciplinary incidents took place after her final performance review, and are therefore especially pertinent to the issue of Broadway's motivation in terminating Swigert.

14

Swigert even admits to the conduct that gave rise to two of her insubordination claims. (Swigert Dep. 76-77, 82-84.) On September 6, 2005, a supervisor named Rodney Briscoe attempted to hand Plaintiff a pager and she refused to accept it. After Briscoe attempted to speak with her, Swigert stated that Ramsey should take the pager and "shove it up her ass."[2] (Swigert Dep. 77; Def.'s Ex. 15.) In the second incident, on November 29, 2005, Swigert failed to hand a pager directly over to Young and then refused to speak to him, stating that she had clocked out. (*Id.* at 84:7-12.) When describing this interaction, Swigert stated that "[h]e is not no king, he's nothing, he's just like me, he's a nobody, and Ms. Ramsey is not going to build him up to be some king." (*Id.* at 83:11-17.)

In light of Swigert's performance record and disciplinary problems, which worsened significantly in the weeks leading up to her termination, this Court finds as a matter of law that Swigert was not meeting her employer's legitimate expectations at the time she was discharged. It is well established that Title VII does not shield employees from warranted disciplinary actions or discharge proceedings. *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981) ([Title VII] "was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work. An employer must retain power to discipline and discharge disobedient employees"). Accordingly, Swigert cannot establish a *prima facie* case of discrimination.

Finally, this Court finds that even if Swigert could establish a *prima facie* case of discrimination, Broadway has provided a nondiscriminatory justification for Swigert's termination. Poor job performance and disciplinary problems are frequently recognized as legitimate bases for an adverse employment action. *See, e.g.*, *Hill*, 354 F.3d at 298; *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996). Swigert, on the other hand,

---

[2] At her deposition, Swigert indicated that she had directed the insult at Briscoe instead of Ramsey. (Swigert Dep. 77.) Nonetheless, the distinction is immaterial because she clearly acted in a rude and insubordinate manner.

has not fulfilled her corresponding burden of proving that Broadway's justification is pretextual. Therefore, Swigert cannot satisfy the remaining burden-shifting requirements of the *McDonnell Douglas* schema.

## II. Title VII Retaliation Claim

Title VII contains, in addition to its general antidiscrimination provision, an antiretaliation provision in Section 704(A) that provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C.A. § 2000e-3(a). This provision is designed to "prevent[] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [Title VII's] basic guarantees." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S 53, 63 (2006). To establish a *prima facie* claim for retaliation, plaintiff must show "(1) that she engaged in a protected activity; (2) that her employer took an employment action against her; and (3) that there was a causal connection between the protected activity and the adverse employment action." *Hill*, 354 F.3d at 298.

Swigert claims that she was terminated because she submitted a complaint letter to Broadway management in which she declared that she was a victim of racial discrimination. In response, Broadway argues that Swigert cannot show that its termination decision was causally related to her issuance of the complaint.

On November 30, 2005, Ramsey submitted the Personnel Transaction Form that authorized Swigert's termination. (Def.'s Ex. 2.) Ramsey made this decision after she was informed by Young about Swigert's insubordinate behavior the prior evening. (Def. Ex. 21 at ¶¶

16

15-16.)  On December 1, Wayne Watson approved Swigert's termination.  (Def.'s Ex. 2.)  That same day, Swigert first alleged race discrimination in a letter that she submitted to Broadway's management.  (Pl.'s Ex. 9.)  Swigert's termination was formally processed on December 2, 2005.

Plaintiff's letter registering an informal complaint concerning race discrimination qualifies as a protected activity.  *See, e.g.*, *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005) ("protected oppositional activities may include staging informal protests and voicing one's own opinion in order to bring attention to an employer's discriminatory activities, as well as complaints . . . about suspected violations.") (internal quotations omitted); *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543-44 (4th Cir. 2003) ("[e]mployees are . . . guaranteed the right to complain to their superiors about suspected violations of Title VII")

However, in order to satisfy the third requirement of a *prima facie* case of retaliation, a plaintiff must show that the materially "adverse employment action took place *after* the filing of the discrimination claim." *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 651 (4th Cir. 2002) (emphasis added).  Swigert fails to meet this requirement because, although her complaint letter was sent on December 1, 2005 and she did not receive notice of her termination until December 2, 2005, the decision to terminate Plaintiff had already been made on November 30, 2005.  (Pl.'s Ex. 3.)  Temporal proximity between a complaint and a termination can sometimes provide an inference of retaliation.  *King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003).  However, such an inference may be eliminated by other evidence showing that a substantial step toward termination had occurred prior to the employee's submission of a complaint.  *See, e.g.*, *Horne v. Reznick Fedder & Silverman*, 154 Fed. Appx. 361, 364 (4th Cir. 2005); *Neishlos v. City of New York*, 2003 U.S. Dist. LEXIS 19554, *27-29 (S.D.N.Y. Nov. 3, 2003).  The crucial inquiry is whether the decisionmaker had knowledge of the protected activity at the time of the

adverse employment action. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("[s]ince, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the *prima facie* case"); *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985) ("if the employer did not know of the protected activity a causal connection to adverse action cannot be established"), *abrogated on other grounds*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1175 (1989).

Ramsey, as Swigert's immediate supervisor, was the principal decisionmaker concerning the termination, and her decision of November 30 is the critical point of reference in the causality inquiry. Although Watson's approval was necessary to consummate the termination, even if he had been aware of Swigert's complaint on December 1,[3] the critical step in the termination process had already occurred. *See, e.g.*, *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (stating that "employers need not suspend previously planned [adverse employment actions] upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitely determined, is no evidence what[so] ever of causality"); *Howell v. Bluefield Reg'l Med. Ctr., Inc.*, No. 07-0112, 2008 U.S. Dist. LEXIS 49632, at *8 (S.D.W.Va. Jun. 23, 2008) ("the timing of the decision itself, not notification, is what is important for establishing a causal connection"). Because Swigert cannot establish the requisite causal connection between her complaint and her termination, she fails to satisfy the third prong of the *prima facie* case for retaliation.

---

[3] There is no evidence that Watson was aware of Swigert's December 1 complaint when he approved the termination on that same day. Indeed, Watson stated that he had no knowledge of Swigert's complaint when he approved her termination. (Def.'s Ex. 36 at ¶ 7.)

Furthermore, even if Swigert were able to state a *prima facie* case, her retaliation claim would nevertheless fail. As explicated above, Swigert's extensive disciplinary record, which culminated in her acts of insubordination just prior to her termination, provides a legitimate and nondiscriminatory justification for her termination. Swigert, on the other hand, has not produced evidence showing that this justification is pretextual.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment (Paper No. 13) is DENIED and Defendant's Cross Motion for Summary Judgment (Paper No. 14) is GRANTED. A separate Order follows.

Date : July 15, 2009                             /s/_____
                                                 Richard D. Bennett
                                                 United States District Judge